# EXHIBIT A

James K. Webber (NJ Attorney ID 020112000)
WEBBER MCGILL LLC
100 E. Hanover Avenue
Cedar Knolls, New Jersey 07927
(973) 739-9559
Attorneys for Plaintiff Hooman Noorchashm

------------------------------------------------------------

| | |
|---|---|
| HOOMAN NOORCHASHM | : SUPERIOR COURT OF NEW JERSEY |
| | : BERGEN COUNTY: LAW DIVISION |
| Plaintiff, | : |
| | : DOCKET NO. |
| | : |
| v. | : |
| | : **COMPLAINT** |
| | : |
| BECTON, DICKINSON AND COMPANY, | : |
| WILLIAM SIGMUND, JOHN DOES 1-10 | : |
| (fictitiously named), and XYZ CORPORATIONS | : |
| 1-10 (fictitiously named) | : |
| | : |
| Defendants. | : |

------------------------------------------------------------

Plaintiff Hooman Noorchashm MD, PhD ("Plaintiff"), a resident of the Commonwealth

of Pennsylvania, residing at 1682 Clydesdale Circle, Yardley, Pennsylvania 19067, by way of a

Complaint against Defendants Becton, Dickinson and Company ("BD"), William Sigmund, John

Does 1-10 (fictitiously named), and XYZ Corporations 1-10 (fictitiously named) (collectively

"Defendants") says:

## **THE PARTIES**

1.      Plaintiff is a  licensed Physician in good standing in the State of New Jersey and

Commonwealth of Pennsylvania, with MD and PhD degrees in immunology, extensive residency

and fellowship training in General and Cardiothoracic surgery and a former employee of BD.

2.      BD is a corporation organized under the laws of the State of New Jersey, and has as its principal place of business a facility located at 1 Becton Drive, Franklin Lakes, New Jersey 07417.

3.      William Sigmund ("Dr. Sigmund") is a medical doctor and BD's Executive Vice President and Chief Medical Officer and, on information and belief, is a resident of the State of Florida.

4.      John Does 1-10 (fictitiously named) are individuals who committed or aided and abetted the illegal and/or actionable conduct described herein.

5.      XYZ Corporations 1-10 (fictitiously named) are corporations that committed or aided and abetted the illegal and/or actionable conduct described herein.


**VENUE**

6.      Venue is appropriate pursuant to R. 4:3-2(a) because the causes of action arose in Bergen County, New Jersey, among other reasons.

**FACTS**

Background

7.      Plaintiff earned an undergraduate degree, a medical degree, and a PhD in Immunology from the University of Pennsylvania.

8.      Plaintiff is licensed to practice medicine in the State of New Jersey and the Commonwealth of Pennsylvania.  Plaintiff also possesses a Federal Drug Enforcement Agency license, which enables Plaintiff to prescribe certain controlled substances.

9.      Plaintiff specialized in general and cardiothoracic surgery and has served on the clinical faculties of the University of Pennsylvania, Harvard Medical School, and Thomas

Jefferson University Hospital and the Philadelphia Veterans Administration Hospital as an Instructor, Lecturer, Assistant Professor or Attending Surgeon.

10.     Plaintiff is also an established and internationally recognized patient safety advocate in the medical device, women's health, and cancer space.

11.     BD hired Plaintiff as BD's Medical Director and Safety Monitor on its Interventional/Surgery platforms in late 2021, and he began work for BD on February 2, 2022.

Plaintiff Blows the Whistle on the P4HB Cancer Risk and the ROSE Clinical Trial

12.     On information and belief, before BD hired Plaintiff, BD purchased a patent for the use of P4HB based mesh products (e.g., Phasix and GalaFlex) in breast reconstruction surgeries from a Florida private practice plastic surgeon named Steven Rhenke, who had performed an off-label pilot study using BD's P4HB based medical device, Phasix, for breast reconstruction in post-mastectomy women with breast cancer (hereinafter the "Rehnke Protocol").

13.     Steven Rehnke is an established BD collaborator and "Key Opinion Leader" ("KOL") to BD.

14.     P4HB is a biologically derived and bioactive material, which is actively metabolized by mammalian cells and tissues and activates a specific M2 macrophage polarized immune response.

15.     BD uses P4HB to construct two-dimensional mesh and three-dimensional scaffold products, known as Phasix$^{TM}$ and GalaFlex$^{TM}$, respectively.

16.     Plaintiff initially expressed concern that the biological origin and specific metabolic/cellular properties of P4HB may require Food and Drug Administration ("FDA") re-

classification of products made of that material to "Biologicals" and not "medical devices" in the interest of safe testing and commercial development – in particular given BD's goal of introducing this biochemically active material into the breast cancer space where this bioactive material will interact with the cancer micro-environment. A "Biological" FDA classification would require far more stringent safety testing than a typical medical device classification. Plaintiff shared that concern and opinion with executive members of BD.

17.     P4HB-based Phasix was originally developed for use in assisting in tissue regeneration after hernia surgeries and for reinforcement of soft tissue defects as a resorbable and presumably safer alternative to polypropylene-based mesh products.

18.     P4HB-based mesh and scaffold products are considered Class 3 medical devices and require FDA approval via the "Pre-Market Approval" (PMA) regulatory pathway before BD could market and sell them for specific indications in human patients, such as breast reconstruction following mastectomy.

19.     To label BD's P4HB-based scaffolds for breast reconstruction using the Rehnke Protocol, in 2019 BD initiated PMA "pre-submission" discussions with the FDA, so that BD could begin designing PMA-directed studies to establish the efficacy of the proposed P4HB-based approach for breast reconstruction surgeries, the vast majority of which take place in women with breast cancer.

20.     BD had a duty to ensure that all known safety concerns associated with the use and testing of P4HB were adequately delineated for the FDA and that BD had assessed the product's safety in proper preclinical and clinical trials prior to initiating a clinical evaluation of P4HB's efficacy, which is necessary for the FDA's PMA.

21.     In or about June 2022, Plaintiff became aware of several specific and serious safety concerns with use and testing of P4HB-based BD products in women with cancer diagnoses.

22.     Plaintiff was concerned with BD projects named PETAL, BLOSSOM, and ROSE, all of which proposed implantation of the biochemically active P4HB materials in direct contact with the breast cancer resection space in women.

23.     Plaintiff became aware that BD had presented the off-label data generated using the Rhenke Protocol in the PMA pre-submission meetings with the FDA on the ROSE clinical trial.

24.     Then-Vice-President of BD Medical Affairs, Dennis McMahon, made Plaintiff aware that Dr. Rhenke had performed the Rhenke Protocol on nearly 50 women with breast cancer without an FDA-required Investigational Device Exemption ("IDE").  It also was unclear to Plaintiff whether Dr. Rhenke had performed his clinical study with the necessary oversight of an Institutional Review Board ("IRB"), which is an ethical requirement when conducting human clinical trials in the US.

25.     Such a study performed without an IDE or IRB oversight would violate federal law and the rules of ethical clinical trial conduct and threaten patient safety by permitting experimental devices to be implanted in women with breast cancer without adequate or legal safety/ethics oversight, disclosure, or proper consent.

26.     The flaws and lack of oversight in the Rhenke Protocol invalidated BD's assumption that the P4HB products were safe to use on breast cancer patients and confirmed Plaintiff's concern that proceeding with an efficacy trial for breast reconstruction was premature and potentially dangerous to the subjects.

27.     Plaintiff's alarm about the Rhenke Protocol heightened when Plaintiff discovered that BD had knowledge of three cancer recurrences in the group of 50 Rehnke breast cancer patients.

28.     Plaintiff expressed his concern about the safety of P4HB to BD colleagues, including Dr. McMahon, William Altonaga (BD's Vice President of Medical Safety), and Adam Rappaport (BD's General Counsel).

29.     Plaintiff informed Drs. McMahon and Altonaga and Mr. Rappaport that a 6% recurrence rate may be higher than expected and might constitute a safety signal, but because Dr. Rehnke had performed his protocol without an IDE, neither BD, nor Dr. Rehnke, had reported those recurrences to the FDA as adverse events.

30.     Plaintiff requested that BD immediately report the P4HB-related cancer recurrences to the FDA, as is required of medical device manufacturers by Federal law any time a medical device, especially one used off-label, may have caused or exacerbated a disease process.

31.     Plaintiff communicated his concerns about the P4HB projects in multiple emails and conversations with Drs. McMahon and Altonaga and Mr. Rappaport.  Plaintiff insisted that BD disclose the safety concerns delineated above to the FDA.

32.     Dr. McMahon made it clear to Plaintiff that Dr. McMahon was not interested in a broad discussion of Plaintiff's concerns and routinely downplayed them, attempting to contain the broader conversations Plaintiff was having with BD colleagues and KOLs.

33.     Dr. McMahon instructed Plaintiff to keep the conversations internal to medical affairs and objected to Plaintiff's safety communications with Dr. Altonaga and Ferass Abuzaina, Vice President and General Manager of the "Advanced Repair and Reconstruction" (AR&R)

6

platform, which was responsible for commercializing BD's P4HB products in breast cancer patients.

34.     In July 2022, BD's attorneys interviewed Plaintiff, and Plaintiff reported his concerns with the Rhenke Protocol and the use of P4HB in breast cancer patients, insisting that the company disclose those issues to the FDA.

35.     Plaintiff also expressed objections to the design of the ROSE clinical trial, specifically based on Plaintiff's concerns for patient safety.

36.     Plaintiff told both Drs. McMahon and Altonaga that BD's ROSE clinical trial, based on the Rehnke Protocol, did not include cancer surveillance and recurrence metrics as "primary metrics."

37.     Plaintiff asserted that the ROSE trials' serious clinical trial design deficit could cause cancer safety signals related to introduction of the P4HB biochemical into the cancer resection space to be missed given the trial's dominant focus on cosmetic breast reconstruction outcomes as the "primary" metric instead of cancer surveillance and recurrence.

38.     Following Plaintiff's formal safety communications to Dr. Altonaga and BD counsel, BD suspended the ROSE clinical trial, which was due to begin sometime in August 2022.


Plaintiff Reports BD's Science Data Pointing to Cancer Risks with Use of P4HB

39.     Plaintiff also raised concerns with a potential increased risk of recurrence/metastasis in breast cancer patients from the use of P4HB in their reconstructive surgeries based on basic science studies published by BD's own collaborators at the University of Pittsburgh.

40.     Dr. Stephen Badylak is a scientist and BD funded collaborator who leads a group of researchers at the University of Pittsburgh's McGowan Institute for Regenerative Medicine ("MIRM").

41.     In 2018-2020, the Badylak group at MIRM performed detailed scientific studies characterizing the cellular response of the host response to the P4HB-based mesh Phasix using direct funding support from BD.

42.     The Badylak studies clearly demonstrated that a population of macrophages, known as M2 macrophages, are activated and polarized in response to P4HB in vivo, which is the bioactive and actively metabolized chemical substance used to create BD's Phasix and GalaFlex.

43.     BD is well aware of the M2 macrophages properties of P4HB-based materials, which are known to have unique anti-microbial and "tissue regenerative" properties and which BD relies on in its marketing documentation promoting Phasix for use in repair of tissue defects and hernias.

44.     Plaintiff's communications with Dr. Badylak and other BD colleagues/collaborators indicated that BD had deliberately downplayed the potential M2-macrophage-related cancer risk of P4HB-based materials in communications with FDA and other partners about its breast reconstruction projects.

45.     In fact, Plaintiff found no substantive evidence that BD had ever informed properly the FDA that the M2 macrophage polarizing characteristic of P4HB might potentiate a metastatic oncological response in the breast cancer studies.

46.     Plaintiff became aware that BD had not performed any in vivo preclinical cancer safety tests using P4HB material to ensure that the material does not exacerbate cancer growth

and metastasis. Performing such in vivo preclinical studies is critically important and is considered a standard scientific/clinical approach when establishing a reasonable assurance of safety prior to initiation of any human clinical trials or off-label use of an existing marketed material, especially a biologically active one like P4HB.

47.     Plaintiff reported the potential cancer risk of P4HB to all relevant parties at BD, including Drs. Altonaga and McMahon and Mr. Abuzaina and requested an immediate halt in progression to clinical trials while BD performed better due diligence to assess the oncological safety of the material preclinically.  Dr. Altonaga stopped the ROSE clinical trials soon after Plaintiff raised his concern.

48.     Plaintiff also pointed out that the use of P4HB in the breast cancer resection space could inhibit vitally important surveillance of patients after use of the implants, meaning that the use of P4HB could make monitoring patients' reconstructed breasts for recurrences of their cancer much more difficult.

49.     In response, Dr. McMahon criticized Plaintiff's communications with Dr. Altonaga and Mr. Abuzaina about the P4HB cancer concerns.

50.     Dr. McMahon claimed that the cancer risk of P4HB had been adequately assessed and that Plaintiff was "yelling fire" about his breast cancer safety concerns with use of P4HB.

51.     Dr. McMahon warned Plaintiff to keep any discussion of the cancer risk associated with P4HB within Dr. McMahon's medical affairs group and insinuated that Plaintiff's conversations with those outside the group had constituted insubordination.

52.     Dr. McMahon was one of the principal architects of the P4HB breast reconstruction platforms (i.e., Projects Petal, Blossom and Rose) at BD and had received

promotion to the position of Vice President of Medical Affairs in July 2022 in part based on his promising performance for the company's growth in the breast reconstruction space.

53.     While Plaintiff was warning BD about the potential dangers of the company's approach to commercializing P4HB in the breast cancer space and was recommending reporting safety concerns to the FDA, Plaintiff also discovered that Dr. McMahon had surrendered his medical license in 2009 due to criminal activity in the State of California, and that Dr. McMahon had misled Plaintiff about Dr. McMahon having an active medical license in the State of Rhode Island.

54.     Plaintiff became concerned that Dr. McMahon might have misled BD about Dr. McMahon's medical credentials and criminal record and believed that Dr. McMahon was engaged in retaliatory actions against Plaintiff because of the serious nature of Plaintiff's P4HB breast cancer concerns and the threat it posed to the business goals of the AR&R platform at the company.

55.     Plaintiff therefore reported to BD's Human Resources Department ("HR") and other members of BD's executive team, including Mr. Rapapport, his knowledge of Dr. McMahon's surrendered medical licensure status and Dr. McMahon's criminal record related to improper use of his California medical license in 2009, and Plaintiff's concern that Dr. McMahon was beginning to retaliate against Plaintiff because of Plaintiff's reports of safety concerns.

56.     BD began an internal ethics investigation in response to Plaintiff's complaint to HR, and eventually terminated Dr. McMahon's employment in August 2022 only a few short weeks after Dr. McMahon had been promoted to the position of Vice President of Medical Affairs at BD.

Plaintiff Becomes Aware of Hundreds of Improperly Reported Adverse Events Related to the Off-Label Use of GalaFlex

57.     GalaFlex is a BD product containing P4HB and sometimes used by physicians off-label in breast reconstruction and augmentation operations.

58.     BD actively promotes off-label use of GalaFlex products for breast reconstruction and breast augmentation operations in women with breast cancer without warning about the potential oncogenic effect of M2 macrophages from P4HB.

59.     In June 2022, Plaintiff was charged with adjudicating hundreds of Adverse Event ("AE") reports related to the off-label use of BD's GalaFlex Scaffold products in breast reconstruction and augmentation operations.

60.     The AEs originated from surgeons who had used GalaFlex Scaffold products in surgical operations and subsequently reported them to the manufacturer.

61.     BD inherited those AEs following its acquisition of Galatea Surgical and Tepha Medical Devices.

62.     Plaintiff reviewed all of the GalaFlex-related AEs presented to him, but it was clear that the AE descriptions did not contain sufficient clinical information or patient follow-up to properly adjudicate the exact nature and severity of the complications in the affected patients.

63.     Plaintiff recognized that not only were the required reporting of the AEs to the FDA significantly delayed because of BD's hasty acquisition of Galatea Surgical, but also that the AEs were being improperly handled from a clinical and medical ethical perspective.

64.     For BD to have adjudicated properly the hundreds of GalaFlex-related AEs, the reporting clinicians would have needed to provide more detailed and specific information on outcomes.

65.     In August 2022, Plaintiff halted his adjudication of the GalaFlex-related AEs, refused to continue with that task under those circumstances, and informed Mr. Rappaport of the potentially illegal or irregular nature of what BD was doing with the AE reports.

66.     Plaintiff instructed his colleagues Karen Doyle and Erin Zook to place immediately all the AE data under the care of Mr. Rappaport for adjudication with FDA guidance.

Plaintiff Insists on BD Reporting a GENESIS Sterilization Container "Aerosol Test" Failure to FDA

67.     In or around July 2022, Plaintiff became aware of problems with an FDA-required safety test of several lines of BD devices called Genesis Sterilization Containers ("GSCs"), which sterilize surgical equipment and are used in millions of operations annually in the United States and across the world.

68.     GSCs are Class 2 medical devices that the FDA cleared for marketing using the FDA's 510(k) pathway.

69.     It is highly important to patient safety for GSCs to function properly because flawed devices could lead to contaminated surgical equipment, which could in turn lead to otherwise preventable but potentially deadly infections in surgical patients. GSCs are therefore mission critical to the safe conduct of millions of surgical operations in the United States.

70.     BD regularly marketed and sold GSCs to United States Government hospitals, including and especially to United States Veterans Administration hospitals.

71.     Many private hospitals in the United States and around the world also make use of those sterilization containers.

72.     Plaintiff was an executive member of the Surgery Field Action Committee ("FAC") at BD, which was a working committee on which Plaintiff served as a signatory member by virtue of his position as Medical Director in the company.

73.     As a member of the FAC, Plaintiff learned that the company from which BD had acquired the GSC patent, CareFusion/V. Mueller, had not tested all of the GSC models at the time of the original 510(k) FDA application for product clearance.

74.     More disturbingly, Plaintiff learned that in 2011, under CareFusion's direction, the GSC models that had not been tested originally later failed the bacterial "aerosol test" required by the FDA for the original 510(k) clearance of the device.

75.     Plaintiff discovered that the "aerosol test" required by the FDA for 510(k) clearance of the GSCs was in actuality negotiated and created by CareFusion in collaboration with FDA regulators, who agreed to the "aerosol challenge" as the necessary "pressure test" to ensure the reasonable safety of the GSCs.  So, the "aerosol test" was in fact a test that the company had designed with the FDA and had agreed to performing in fulfillment of the agency's 510(k) clearance requirements.

76.     Plaintiff also learned that CareFusion had not reported that 2011 test failure to the FDA, as required by law. In fact, based on documents from CareFusion, Plaintiff confirmed that CareFusion had deliberately concealed that safety failure from the FDA and consumers starting in October 2011.

13

77.     Failure of the aerosol test indicates that at least some portion of the GSCs BD sold to thousands of customers were defective, and that defect endangered the health and safety of patients in operating rooms reliant on the GSCs.

78.     The GSC aerosol test failure became known to the entire FAC, which undertook several steps to address the issue, including completing Situation Analysis and Health Risk Assessment documents.

79.     The last step the FAC had to perform to correct the unsafe and illegal status of the GSCs was to prepare a Field Action Document that would, among other things: set out a plan for informing hospitals and doctors of the failed aerosol test so that they could ensure the sterility of their surgical instruments; inform the FDA of the failed aerosol test, as is required by law; and plan a withdrawal of the unsafe GSCs from the relevant market.

80.     Due to the seriousness of the issues with the GSCs, BD's Senior Vice Presidents of Quality, Regulatory, and Legal joined the discussions about correcting the GSC issues with the FAC's regular members.

81.     Rather than create a Field Action Document to correct the safety issue with the GSCs and mitigate whatever health and legal violations had occurred, BD's Senior Vice President of Quality, Jerry Perreira, downplayed the seriousness of the issues surrounding the GSCs in committee discussion.

82.     At Mr. Perreira's behest, BD hired an expert named Ellaine Daniel to discredit the aerosol safety test's validity and created an expert document to that effect for the FAC files.

83.     Mr. Perreira suggested a gradual replacement of the product with the next generation of sterilization device, and resisted any suggestion that the FDA or consumers be informed of the safety defect.

84.     Plaintiff was disturbed to find that the upper management of BD seemed to have no plans to inform consumers or the FDA of the GSC safety failure.

85.     Plaintiff reasonably believed that the steps recommended by Mr. Perreira did not cure the problems with the GSCs and only perpetuated a violation of law, improper patient care, and a threat to the health and safety of the public.

86.     On August 8, 2022, following a FAC meeting in which Plaintiff expressed his dissenting vote on not informing consumers and the FDA of the GSC defects, Plaintiff sent two emails to BD senior leadership identifying his concerns on how the executive team was moving to handle the GSC issues.

87.     Plaintiff objected to the absence of a clearly delineated reporting plan to the FDA and consumers described by the circulated draft of the Field Action Document. Plaintiff demanded that BD correct that omission.

88.     Plaintiff believed Dr. Sigmund had begun retaliating against him because of Plaintiff's vocal objections to BD's handling of the GSC issues and the P4HB breast cancer concerns.

89.     On or about August 5, 2022, Plaintiff filed an internal BD ethics complaint against Dr. Sigmund reporting his concern that Dr. Sigmund might move to terminate him based on Plaintiff's vocal reports of safety concerns with P4HB and then the GSCs.

90.     On August 9, 2022, Dr. Sigmund requested a telephone conversation with Plaintiff via two emails, while Plaintiff was on a planned family vacation with his children.

91.     Plaintiff, sensing oncoming retaliatory action, responded to those emails in the affirmative with the added request that BD's general counsel and Plaintiff's personal counsel also be present. Dr. Sigmund did not respond to those requests.

92.     In a third email on August 9, 2022, after Plaintiff had agreed twice to a conversation with the added request for the presence of counsel, Dr. Sigmund abruptly informed Plaintiff, via email, that BD had terminated his employment effective immediately, without warning, cause, or severance.

93.     On October 4, 2022, approximately seven weeks after terminating Plaintiff as Medical Director, BD announced a "voluntary" recall of the GSCs from the American and Canadian healthcare marketplaces.

## COUNT ONE

**(Retaliation in Violation of the Conscientious Employee Protection Act,
N.J.S.A. 34:19-1 to -8)**

94.     Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if stated herein in full.

95.     On multiple occasions, Plaintiff disclosed to supervisors and objected to actions that Plaintiff reasonably believed violated law and public policy as expressed in statute and regulations, constituted improper quality of patient care, and was incompatible with a clear mandate of public policy concerning the public health, safety, and welfare.

96.     In disclosing and objecting to those actions, Plaintiff engaged in protected activity under the Conscientious Employee Protection Act ("CEPA,") N.J.S.A. 34:19-1 to - 8.

97.     In violation of CEPA, Defendants retaliated against Plaintiff for Plaintiff's undertaking of his protected activities by terminating Plaintiff's employment.

98.     As a result of Defendants' actions, Plaintiff has suffered damages.

## COUNT TWO

### (Common Law Wrongful Discharge)

99.     Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if stated herein in full.

100.     Plaintiff reasonably believed that BD had violated a law, rule, or regulation by submitting improper and illegally obtained data to the FDA to support the approval of P4HB in breast cancer reconstruction, promoting a product that posed a significant cancer risk to patients, and failing and refusing to inform the FDA about the failed Genesis aerosol safety test.

101.     Plaintiff reported those violations to supervisors and objected to their continuation.

102.     Defendants terminated Plaintiff's employment in retaliation for Plaintiff's reporting of and objecting to the violations.

103.     Defendants' actions constitute common law wrongful discharge and a violation of the public policy of the United States and the State of New Jersey.

104.     As a result of Defendants' actions, Plaintiff has suffered damages.


## COUNT THREE

### (Retaliation in Violation of the False Claims Act, 37 U.S.C. § 3730(h))

105.     Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if stated herein in full.

106.     By objecting to and demanding the reporting of safety violations relating to GSCs, Plaintiff took steps in furtherance of an action under 37 U.S.C. § 3730 and to stop violations of the False Claims Act.

107.    Defendants terminated Plaintiff's employment because of Plaintiff's actions, in violation of 37 U.S.C. § 3730(h).

108.    As a result of Defendants' actions, Plaintiff has suffered damages.

**WHEREFORE,** Plaintiff demands judgment against Defendants as follows:

A.      Awarding compensatory damages to Plaintiff for backpay, frontpay, and emotional distress;

B.      Awarding punitive damages to Plaintiff;

C.      Awarding exemplary damages to Plaintiff;

D.      Awarding attorneys' fees and legal costs to Plaintiff;

E.      Awarding prejudgment interest to Plaintiff; and

F.      Granting such other and further relief as the Court deems just and equitable.

WEBBER MCGILL LLC
100 E. Hanover Avenue
Cedar Knolls, New Jersey 07927
(973) 739-9559
Attorneys for Plaintiff Hooman Noorchashm, MD, PhD

By: _____
        James K. Webber

Dated:  October 17, 2022

## JURY DEMAND

Plaintiff demands a jury trial on all issues so triable contained herein.

> WEBBER MCGILL LLC
> 100 E. Hanover Avenue
> Cedar Knolls, New Jersey 07927
> (973) 739-9559
> Attorneys for Plaintiff Hooman Noorchashm, MD, PhD

By: _____
      James K. Webber

Dated:  October 17, 2022

## CERTIFICATION PURSUANT TO R. 4:5-1

Pursuant to R. 4:5-1, I hereby certify that, to the best of my knowledge that the above-captioned action is not the subject of any other action pending in any court or the subject of a pending arbitration proceeding, and no other action or arbitration proceeding is contemplated.  I further certify that, to the best of my present knowledge, no other parties need be joined in this matter.  I certify that the foregoing statements made by me are true.  I am aware that, if any of the foregoing statements are willfully false, I am subject to punishment.

> WEBBER MCGILL LLC
> 100 E. Hanover Avenue
> Suite 401
> Cedar Knolls, New Jersey 07927
> Attorneys for Plaintiff Hooman Noorchashm, MD, PhD

By: _____
      James K. Webber

Dated:  October 17, 2022

## DESIGNATION OF TRIAL COUNSEL

James K. Webber is hereby designated as trial counsel in this matter.

<div style="margin-left:40%">

WEBBER MCGILL LLC
100 E. Hanover Avenue
Suite 401
Cedar Knolls, New Jersey 07927
Attorneys for Plaintiff Hooman Noorchashm, MD,
PhD

By: _____
    James K. Webber

</div>

Dated:  October *17*, 2022

# Civil Case Information Statement

## Case Details: BERGEN | Civil Part Docket# L-005589-22

**Case Caption:** NOORCHASHM HOOMAN  VS BECTON DICKINSON AND  COMPA

**Case Initiation Date:** 10/17/2022

**Attorney Name:** JAMES KEVIN WEBBER

**Firm Name:** WEBBER MCGILL LLC

**Address:** 100 E. HANOVER AVE STE 401 CEDAR KNOLLS NJ 07927

**Phone:** 9737399559

**Name of Party:** PLAINTIFF : Noorchashm, Hooman

**Name of Defendant's Primary Insurance Company** (if known): Unknown

**Case Type:** WHISTLEBLOWER / CONSCIENTIOUS EMPLOYEE PROTECTION ACT (CEPA)

**Document Type:** Complaint with Jury Demand

**Jury Demand:** YES - 6 JURORS

**Is this a professional malpractice case?**  NO

**Related cases pending:** NO

**If yes, list docket numbers:**

**Do you anticipate adding any parties (arising out of same transaction or occurrence)?** NO

**Does this case involve claims related to COVID-19?** NO

**Are sexual abuse claims alleged by: Hooman Noorchashm? NO**

## THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE
### CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

**Do parties have a current, past, or recurrent relationship?** YES

**If yes, is that relationship:** Employer/Employee

**Does the statute governing this case provide for payment of fees by the losing party?** YES

**Use this space to alert the court to any special case characteristics that may warrant individual management or accelerated disposition:**

**Do you or your client need any disability accommodations?** NO
> **If yes, please identify the requested accommodation:**

**Will an interpreter be needed?** NO
> **If yes, for what language:**

**Please check off each applicable category: Putative Class Action?** NO  **Title 59?** NO  **Consumer Fraud?** NO

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

10/17/2022
Dated

/s/ JAMES KEVIN WEBBER
Signed

# **EXHIBIT B**

```
BERGEN COUNTY COURTHOUSE
SUPERIOR COURT LAW DIV
BERGEN COUNTY JUSTICE CTR RM 415
HACKENSACK        NJ 07601-7680
                                    TRACK ASSIGNMENT NOTICE
COURT TELEPHONE NO. (201) 221-0700
COURT HOURS  8:30 AM - 4:30 PM


                          DATE:   OCTOBER 17, 2022
                          RE:     NOORCHASHM HOOMAN  VS BECTON DICKINSON AND  COMPA
                          DOCKET: BER L -005589 22


     THE ABOVE CASE HAS BEEN ASSIGNED TO:  TRACK 3.

     DISCOVERY IS   450 DAYS AND RUNS FROM THE FIRST ANSWER OR 90 DAYS
FROM SERVICE ON THE FIRST DEFENDANT, WHICHEVER COMES FIRST.

     THE PRETRIAL JUDGE ASSIGNED IS:  HON LISA PEREZ-FRISCIA

      IF YOU HAVE ANY QUESTIONS, CONTACT TEAM      003
AT:  (201) 527-2600.

     IF YOU BELIEVE THAT THE TRACK IS INAPPROPRIATE YOU MUST FILE A
 CERTIFICATION OF GOOD CAUSE WITHIN 30 DAYS OF THE FILING OF YOUR PLEADING.
     PLAINTIFF MUST SERVE COPIES OF THIS FORM ON ALL OTHER PARTIES IN ACCORDANCE
WITH  R.4:5A-2.
                          ATTENTION:
                               ATT: JAMES K. WEBBER
                               WEBBER MCGILL LLC
                               100 E. HANOVER AVE
                               STE 401
                               CEDAR KNOLLS      NJ 07927


ECOURTS
```

**SUPERIOR COURT OF NEW JERSEY - eCOURTS CIVIL LAW**

The following clerk notice is being sent from eCourts:

| | |
|---|---|
| Plaintiff Name: | HOOMAN NOORCHASHM |
| Defendant Name: | BECTON DICKINSON AND COMPANY, WILLIAM SIGMUND |
| Case Caption: | NOORCHASHM HOOMAN  VS BECTON DICKINSON AND  COMPA |
| Case Number: | BER L 005589-22 |
| Docket Text: | **CLERK NOTICE**: re: Complaint LCV20223673890 -Please be advised that ACMS has been updated to reflect DTC as indicated on the complaint. |
| Transaction ID: | LCV20223676761 |

**Notice has been electronically mailed to:**

| | | |
|---|---|---|
| Plaintiff Attorney | JAMES KEVIN WEBBER | JWEBBER@WEBBERMCGILL.COM |
| | | MPROCANIK@WEBBERMCGILL.COM |

**Notice was not electronically mailed to:**

| | | |
|---|---|---|
| Defendant | BECTON DICKINSON AND COMPANY | NJ 00000 |
| Defendant | WILLIAM SIGMUND | FL 00000 |

Login to eCourts to view the Case Jacket. You will need a valid user ID (Bar ID) to view the submitted documents.

For questions, please contact the Superior Court of New Jersey Civil Division in county of venue.

This communication is for notification purposes only.

This email was sent from a notification-only address that cannot accept incoming mail. Please do not reply to this message.

**SUPERIOR COURT OF NEW JERSEY - eCOURTS CIVIL LAW**

The following clerk notice is being sent from eCourts:

| | |
|---|---|
| Plaintiff Name: | HOOMAN NOORCHASHM |
| Defendant Name: | BECTON DICKINSON AND COMPANY, WILLIAM SIGMUND |
| Case Caption: | NOORCHASHM HOOMAN  VS BECTON DICKINSON AND  COMPA |
| Case Number: | BER L 005589-22 |
| Docket Text: | **CLERK NOTICE**: re: Complaint LCV20223673890 -The data entered in eCourts (data) does not match the information contained in the document(s). In order to correct data, a motion must be made pursuant to R. 1:5-6. |
| Transaction ID: | LCV20223676771 |

**Notice has been electronically mailed to:**

| | | |
|---|---|---|
| Plaintiff Attorney | JAMES KEVIN WEBBER | JWEBBER@WEBBERMCGILL.COM |
| | | MPROCANIK@WEBBERMCGILL.COM |

**Notice was not electronically mailed to:**

| | | |
|---|---|---|
| Defendant | BECTON DICKINSON AND COMPANY | NJ 00000 |
| Defendant | WILLIAM SIGMUND | FL 00000 |

Login to eCourts to view the Case Jacket. You will need a valid user ID (Bar ID) to view the submitted documents.

For questions, please contact the Superior Court of New Jersey Civil Division in county of venue.

This communication is for notification purposes only.

This email was sent from a notification-only address that cannot accept incoming mail. Please do not reply to this message.

# **EXHIBIT C**

James K. Webber (NJ Attorney ID 020112000)
WEBBER MCGILL LLC
100 E. Hanover Avenue
Suite 401
Cedar Knolls, New Jersey 07927
(973) 739-9559
Attorneys for Plaintiff Hooman Noorchashm

| | |
|---|---|
| HOOMAN NOORCHASM,<br><br>                         Plaintiff,<br><br>     vs.<br><br>BECTON, DICKINSON AND COMPANY,<br>WILLIAM SIGMUND, JOHN DOES 1-10<br>(fictitiously named), and XYZ<br>CORPORATIONS 1-10 (fictitiously named)<br>                         Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION – BERGEN COUNTY<br><br>DOCKET NO.: BER-L-5589-22<br><br>**ACKNOWLEDGMENT OF SERVICE** |

IT IS HEREBY STIPULATED AND AGREED by counsel for Plaintiff Hooman Noorchashm and Defendants Becton, Dickinson and Company and William Sigmund ("Defendants") that Defendants' counsel has accepted service on behalf of Defendants on November 17, 2022, and Defendants waive any and all defenses alleging that the manner in which Defendants have been served was defective and/or insufficient.

s/ James K. Webber, Esq.
WEBBER MCGILL LLC
Attorneys for Plaintiff Hooman Noorchashm


Dated: November 17, 2022

s/ Thomas A. Linthorst, Esq.
MORGAN, LEWIS & BOCKIUS LLP
Attorneys for Defendants Becton, Dickinson
and Company and William Sigmund


Dated: November 17, 2022